Approved: *Michael D. Neff* (signature)
MICHAEL D. NEFF
SEBASTIAN SWETT
Assistant United States Attorneys

Before:     THE HONORABLE SARAH NETBURN
            United States Magistrate Judge
            Southern District of New York

**23 MAG 3027**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

GERALD SHAW,
  a/k/a "Jerry Shaw,"

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of 18 U.S.C.
§§ 1343, 1349, and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

TODD L. KANESHIRO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Wire Fraud Conspiracy)

1. From at least in or about 2016 up to and including at least in or about 2020, in the Southern District of New York and elsewhere, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2. It was a part and object of the conspiracy that GERALD SHAW, a/k/a "Jerry Shaw," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, SHAW agreed with others to engage in an advanced fee fraud scheme through which SHAW and his co-conspirators falsely represented to victims that a purported financial institution, Dominion Bank, as well as its affiliates, would obtain substantial financing or credit for victims in exchange for large up-front

payments, when in fact no financing existed, the victims did not receive the promised credit, and Dominion generally refused to provide refunds requested by victims.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

3.    From at least in or about 2016 up to and including at least in or about 2020, in the Southern District of New York and elsewhere, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SHAW and others engaged in an advanced fee fraud scheme through which false representations were made to victims that a purported financial institution, Dominion Bank, as well as its affiliates, would obtain substantial financing or credit for victims in exchange for large up-front payments, when in fact no financing existed, the victims did not receive the promised credit, and Dominion generally refused to provide refunds requested by victims, which scheme was furthered through interstate wires to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 & 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am currently assigned to an FBI squad that focuses principally on complex financial crimes, including, among other things, securities fraud, commodities fraud, and bank fraud. I have worked for the FBI for approximately seven years, during which time I have participated in investigations of fraud and money laundering, including fraudulent schemes involving fraudulent bank documents, and am familiar with some of the means and methods used to commit such offenses, including the use of email communications.

5.    I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise. Moreover, all dates and amounts are approximate.

## Overview

6.      Since in or about 2019, FBI and the U.S. Department of Homeland Security—Homeland Security Investigations ("HSI") have been investigating a fraud scheme involving Dominion Bank, Dominion Bank and Trust Company Limited, Dominion Global Investment Capital Trust, Dominion Global Partners Limited, and other related Dominion entities (collectively, "Dominion" or "Dominion Bank"). From its formation in or about late 2015 until at least in or about July 2020, Dominion was a purported financial institution that claimed to be able to extend and facilitate financing for small businesses—including in the commodities, film production, and oil importation businesses—in exchange for an advanced fee or deposit.

7.      In fact, based upon my participation in this investigation—including my review of financial information, business records, emails, electronic devices, websites, and interviews of various victims, as set forth in greater detail below—Dominion operated an advanced fee fraud scheme (the "Scheme"). As part of the Scheme, Scheme members instructed victims to wire tens or hundreds of thousands of dollars to Dominion as a deposit or servicing fee for future financing or credit based on representations that Dominion could provide such services. Those representations were false. In fact, no financing existed; the victims did not receive the promised credit; and the victims were generally unable to get their money back, as Dominion typically did not return funds to victims but instead, kept victims' money and in some instances even responded to refund requests by sending invoices for additional amounts.

8.      To date, this investigation has revealed that Dominion defrauded approximately 60 victims in total (individual and corporate) out of more than approximately $4 million. Of this amount, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, received at least tens of thousands of dollars in total from at least approximately 59 separate payments.

9.      From at least in or about October 2016 until at least in or about April 2020, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, was employed by Dominion as the Compliance Officer, Chief Compliance Officer, Senior Compliance Officer, and/or Global Compliance Officer. In that role, SHAW's responsibilities included, by his own admission, drafting various documents including loan agreements, safe keeping receipts ("SKR"), asset management agreements, and standby letters of credit (*i.e.*, "SBLCs"), which are discussed in detail below in the next section. SHAW served as Dominion's Compliance Officer despite the fact that he is a convicted felon and disbarred attorney. Specifically, based upon my review of criminal history records and law enforcement databases, I have learned, among other things, that (1) in or about July 2010, SHAW pleaded guilty to wire fraud in violation of 18 U.S.C. § 1343 for his role in a high-yield investment fraud scheme, and he was sentenced to 70 months in prison, *see U.S. v. Shaw*, 8:07-cr-00191 (C.D. Ca.), Dkt. Nos. 66, 144, 145; (2) SHAW was previously an attorney licensed to practice law in the State of California; and (3) in or about 2011, SHAW was disbarred.

10.     Based on my review of emails obtained through a judicially authorized search warrant, I am aware that, on or about June 8, 2018, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, sent an email to two Dominion officers in which SHAW acknowledged that Dominion lacked funds. Among other things, SHAW wrote that Dominion was "20 weeks behind" in paying SHAW's "$500 a week salary"; and SHAW added that, "On several occasions, I have indicated to

3

you that I know Dominion does not have the money to pay my $500 a week [salary]." Nonetheless, SHAW continued his involvement in the Scheme after June 2018, despite his awareness that Dominion was selling worthless financial instruments because it lacked the assets and ability to back up its representations. For instance, in December 2018, SHAW was involved in Dominion's issuance or sale of an approximately $50 million financial instrument and an approximately $25 million financial instrument; in each instance, Dominion represented, as guarantor, that it had assets sufficient to cover each financial instrument.

## Background – SBLCs

11.    Based on my review of publicly available information, as well as my conversations with others including others in law enforcement, I am aware of the following, among other things:

    a.    A standby letter of credit, or an "SBLC," is a legal document between a bank and its client. An SBLC is most frequently sought by a business that is seeking to obtain a contract. That business goes to a bank to obtain an SBLC, which has various advantages when the client is then pursuing business opportunities in the global economy.

    b.    An SBLC typically does two things. First, the bank vouches for the credit-worthiness of its client (after appraising the client's credit-worthiness). This supplies legitimacy to its client because of what it conveys about the client's ability to satisfy financial obligations associated with business dealings. This is the "letter of credit" portion of the SBLC. Second, the bank becomes the guarantor. The bank promises that, in a worst-case scenario where its client cannot meet its obligations, the bank will satisfy those obligations. This is the "standby" portion of the SBLC, as the bank is on standby as a guarantor, *i.e.*, SBLCs are used as "payment of last resort" if the client fails to fulfill a contractual commitment with a third party. The client pays the bank for an SBLC, typically a percentage of the total obligation that the bank has agreed to guarantee.

    c.    An SBLC conveys various benefits. First, an SBLC helps facilitate trade, especially international trade, including between entities that do not know each other, may never have transacted before, and may be subject to different regulations. An SBLC helps facilitate trade in part because the seller knows that it is guaranteed to get paid, one way or another (*i.e.*, by the client or by its guarantor, the bank). Second, an SBLC can help encourage potential investors to lend money to small businesses, because an SBLC assures investors that, in the event of a default by the recipient of the loaned funds, the bank will step in and make the investors whole. And third, an SBLC increases predictability. The bank is responsible only if the SBLC is followed precisely. Thus, an SBLC reduces the risk that a buyer will change or cancel its order, because if it did so, it would lose the bank's guarantee.

## Dominion: Background and Red Flags

12.    This investigation—including FBI and HSI's review of financial information, business records, emails, electronic devices, websites, court filings, and interviews of various victims and of certain individuals who participated in the Scheme (one of which was GERALD SHAW, a/k/a "Jerry Shaw," the defendant)—has revealed various "red flags"—indicia that

4

Dominion was not a legitimate financial institution—in the way that Dominion operated, including the following:

      a.    *Dominion's Website and Misrepresentations*: Dominion maintained a website that marketed its financial services (the "Website"). I have reviewed an archived-version of the Website. Based on my review of the archive of the Website, I have learned, in substance and in part, the following:

      i.    The Website stated that Dominion Bank was registered in Mwali and The Gambia. However, as Dominion officers ultimately acknowledged, for at least some of the Scheme, Dominion Bank in fact lacked a valid or active banking license in Mwali. (Ultimately, Dominion appears to have paid to reactivate its banking license in Mwali.)

      ii.    The Website also stated that Dominion Bank and Trust Company Limited was a registered statutory trust under the U.S. Investment Company Act. However, based on my review of the databases maintained by the Securities and Exchange Commission (the "SEC"), I have learned that Dominion Bank and Trust Company Limited is not registered under the Investment Company Act.

      iii.    For a period, the Website claimed that Dominion Bank was issuing securities backed by a prominent broker-dealer based in Massachusetts ("Corporate Victim-1"). Corporate Victim-1, however, has asserted that this is untrue and that there was no relationship whatsoever between the two entities: On or about November 20, 2017, Corporate Victim-1 sent a cease-and-desist letter to the president of Dominion, demanding that Dominion stop using Corporate Victim-1 in its promotional materials, including on the Website. In that letter, Corporate Victim-1 wrote that, while Dominion held itself out as a provider of financial consulting records, Corporate Victim-1's review of SEC and Financial Industry Regulatory Authority ("FINRA") ) records of registered investment companies revealed no entities with Dominion's name or with the registration number provided on the Website. Approximately one month later, Corporate Victim-1 filed a trademark infringement complaint with the web-hosting company that hosted the Website. Shortly thereafter, Dominion removed the content in question from the Website.

      iv.    Dominion marketed (purported) financing products on the Website, including SBLCs.

      b.    *Virtual Office*: On its Website, Dominion claimed to have an office on State Street in New York, New York ("Address-1"), which is in Manhattan's Financial District. Based on my involvement in this investigation, including visiting Address-1 and reviewing records related to Address-1, I have learned, in substance and in part, that during the Scheme, Address-1 was a virtual office shared by numerous clients. (Dominion also claimed to have offices abroad.)

      c.    *Assets*: This investigation has revealed examples in which Dominion officers claimed that Dominion had an extremely large volume of assets (*e.g.*, billions in assets). However, an extensive review of financial records reveals that Dominion Bank generally had tens of thousands of dollars (and sometimes hundreds of thousands of dollars) in its bank accounts—and infrequently had over $1 million. In addition, at times, some of Dominion Bank's domestic

bank accounts had a negative account balance for multiple days. This overall financial portrait is dramatically different from what Dominion Bank claimed, and much too small for Dominion Bank to have guaranteed the transactions it repeatedly did, as set forth in the SBLCs it issued.

        d.    *Use of Other Banks to Operate Dominion Bank*: Unlike legitimate banks—which have cash on hand and accounts held at the bank itself—this ongoing investigation has uncovered no evidence of bank accounts held at Dominion itself. Rather, extensive financial analysis has revealed that Dominion appears to have opened and used bank accounts at other (legitimate) banks, to try to operate Dominion Bank. And at least one of those "external" bank accounts was ultimately closed by the bank (not by Dominion).

        e.    *Rapid Withdrawals*: A financial analysis of bank accounts in the names of Dominion Bank and its officers (and its officers' entities) has revealed that, when Dominion Bank did receive payments, largely equivalent funds were typically transferred out of Dominion Bank accounts rapidly—often to non–Dominion Bank accounts controlled by Dominion Bank's officers, officers' relatives, or associates.

        f.    *Method of Payment*: Analysis of bank accounts in the name of Dominion Bank does not suggest that Dominion has a typical payroll; for instance, there appear to be no debits involving payroll companies or repeated payments to employees at regular intervals. Rather, funds from Dominion Bank accounts were often transferred to either (1) Dominion officers personally (or one of their relatives), or (2) other entities controlled by principals of Dominion Bank, including apparent shell companies.

        g.    *Dominion's Compliance Officer is a Disbarred Attorney*: Dominion Bank and/or its officers represented to victims that its Compliance Officer was SHAW. As described above, SHAW is a convicted felon and a disbarred attorney.

        h.    *Dominion's Accountant Lacked a Valid Accounting License*: A Dominion officer asked an accountant (the "Accountant") to conduct an audit of Dominion, even though the Accountant's accounting license had been revoked. After the Accountant completed Dominion's financial statements, the Accountant could not find anyone to sign off on an audit for Dominion. The Accountant then prepared a (purported) "Independent Auditor's Report" and signed it using the name of an accounting firm owned by two acquaintances, without their knowledge.

        i.    *Fabricated Bank Statements*: Dominion provided its customers (*i.e.*, victims) with fabricated bank statements, which claimed to show that its customers had substantial assets in their Dominion accounts. For instance, a fabricated bank statement claimed that a particular customer had $150 million in its Dominion bank account, which this customer could then show others to facilitate transactions. However, these Dominion-provided bank statements all appear to be fabricated because, among other things: (1) this investigation has uncovered no evidence to date that such accounts existed at all at Dominion; and (2) Dominion's assets under control (at external banks) were a mere fraction of the amounts claimed, as the amount in Dominion's bank accounts rarely exceeded $1 million at any given time.

j.     *No SBLC Denials*: The investigation has uncovered no evidence to date that Dominion Bank has ever denied an application for an SBLC.

k.     *Worthless SBLCs*: According to several victims interviewed during this investigation, other financial institutions have described SBLCs issued by Dominion Bank as being worthless. As one victim explained, a potential counterparty described Dominion's SBLC as a "worthless piece of paper." Another individual explained that a potential counterparty described Dominion's $4 million SBLC as not "worth the paper it's printed on." Similarly, one vendor told a victim that Dominion was "a bullshit bank." Indeed, this investigation has not revealed any instances in which a Dominion customer was able to execute a transaction based on a Dominion Bank SBLC.

l.     *Use of "Relay Banks"*: SWIFT—the Society for Worldwide Interbank Financial Telecommunication—supplies a network that allows financial institutions across the globe to communicate securely about financial transactions. Dominion Bank appears to have had a "SWIFT code," which (as a technical matter) would give Dominion Bank access to the SWIFT system. However, Dominion Bank did not have established relationships with other financial institutions, which (as a practical matter) were necessary to use SWIFT to facilitate the transfer of funds. Thus, Dominion Bank appears to have used "relay banks"—*i.e.*, Dominion asked other banks to serve as the messenger and relay its messages, using SWIFT, to the intended recipient of the message (the "recipient bank").

## Victim-1 and Victim-2

13.    Based on my interview of a victim of the Scheme ("Victim-1"), as well as documents provided by Victim-1 and records obtained during this investigation, I have learned, among other things, the following:

a.     In or about April 2018, Victim-1 formed a company ("Company-1") to acquire and trade credit instruments, including SBLCs, both for Company-1 and on behalf of other companies.

b.     A client of Company-1 sought financing for a $250 million project. An associate of Victim-1 ("Associate-1") referred Victim-1 to Dominion, stating that Dominion had significant cash resources to lend out through credit instruments. Victim-1 learned, in substance and in part, that Dominion would charge fees, as well as a percentage of Company-1's profits, in exchange for the credit instrument.

c.     Victim-1 began speaking with individuals at Dominion, including GERALD SHAW, a/k/a "Jerry Shaw," the defendant, as well as a "Vice President" at Dominion ("CC-1"). CC-1 told Victim-1, among other things, that Dominion was incorporated in Delaware and subject to U.S. regulations and that Dominion had between approximately $24 billion and $28 billion in assets.

d.     CC-1 also told Victim-1, in substance and in part, that Dominion had access to the SWIFT system—a global messaging system used among banks—and that Dominion's SWIFT messages would be accepted by other banks.

7

e.  CC-1 further told Victim-1, in substance and in part, that Dominion could open an account for Company-1. Those funds would be administratively blocked, meaning neither Victim-1 nor Company-1 could withdraw them, but Dominion could issue SBLCs based on the funds in the account. According to CC-1, Dominion charged a $30,000 "relationship fee," as well as a fee of approximately 1% for any financial instrument. SHAW sent certain invoices to Victim-1 for Dominion's fees.

f.  Between in or about May 2018 and in or about July 2018, Company-1 wired approximately $130,000 to Dominion at Victim-1's direction and based in part on information CC-1 and SHAW had provided about Dominion. An associate of Victim-1 ("Victim-2") also sent approximately $50,000 to Dominion on behalf of Company-1. The purpose of these payments included a relationship fee and paying Dominion for a $50 million SBLC.

g.  In or about May 2018, SHAW began communicating with Victim-1 regarding an SBLC that Dominion was purportedly preparing for Company-1. On or about May 11, 2018, SHAW forwarded a copy of Dominion's SBLC application to Victim-1.

h.  On or about May 14, 2018, SHAW sent Victim-1 a $50,000 invoice representing Dominion's "issuance fee" for a $50 million SBLC.

i.  On or about June 7, 2018, SHAW sent Victim-1 an email to confirm that Dominion had sent SWIFT messages to two financial institutions, essentially proposing transactions between Dominion and each recipient bank. SHAW attached the SWIFT messages to his email; these SWIFT messages revealed that Dominion did not have its own access to the SWIFT network. Rather, Dominion had sent these SWIFT messages, to other financial institutions, using a relay bank based in Brazil ("Bank-1"). In these relay messages, Bank-1 conveyed Dominion's SWIFT message—that Dominion was "ready, willing and able to block cash funds in the total amount of" $50 million. And in the relay messages, Bank-1 noted that it was merely "relay[ing] the msg received from Dominion Bank" but did not have "any involvement" itself in the transaction.

j.  Prior to seeing this message, Victim-1 had understood, based on CC-1's representations, that Dominion had its own access to the SWIFT system. Victim-1 had previously experienced difficulty dealing with Bank-1, which Victim-1 raised with CC-1. CC-1 stated, in substance and in part, that Dominion had a pending application for independent access to the SWIFT system. Moreover, CC-1 told Victim-1 that Dominion had a good relationship with Bank-1, which had resolved its past issues.

k.  Bank-1 transmitted the SBLC to a Turkish bank ("Bank-2") on or about July 18, 2018. Bank-2 acknowledged receipt but stated it would take no action on the SWIFT message from Bank-1; in other words, Bank-2 declined to enter into a transaction with Dominion Bank. SHAW informed Victim-1, in substance and in part, that he would be contacting Bank-2 to determine why the message was rejected. On or about July 24, 2018, SHAW sent an email to a Bank-2 employee, copying Victim-1, asking for a contact person to "discuss the reasons for [Bank-2's] 'Non-action'" of the SWIFT message.

8

l.  In or about September 2018, Victim-1 requested a "tear sheet," which, based on my involvement in this investigation, I understand was a copy of Company-1's account statement at Dominion signed by Dominion's president ("CC-2"). On or about September 11, 2018, SHAW sent a text message to CC-1 stating, "I have an email from [Victim-1] regarding a 'tear sheet.' Please call me a[]nd give me some direction?! I don't know what do to?"

m.  Approximately fifteen minutes later, SHAW sent an email to Victim-1, CC-1, CC-2, and others, attaching the requested "tear sheet" and affirming that CC-2 would certify the record that day. The attached document was a "Corporate Trust Account" statement on Dominion letterhead, showing a (purported) balance of $150,000,000 in the account. (As Victim-1 and Victim-2 made additional payments to Dominion between May and July 2018, the amount of money purportedly in their Dominion account increased.)

n.  On or about December 11, 2018, Victim-1 sent an application to SHAW and CC-1, requesting a $50 million Dominion SBLC to deliver physically to another bank ("Bank-3") as part of a pending commodities transaction. On or about December 12, 2018, SHAW sent a text message to CC-1 stating, "Do you want me to work on [Victim-1]; I.e. Indemnification and SBLC? If so how much do we charge him?" On or about December 13, 2018, the email account "compliance@bankdominion.com" sent Victim-1 an email informing Victim-1 that the SBLC was approved.

o.  After receiving the SBLC, Bank-3 attempted to verify Dominion's bank license and learned that Dominion's Mwali license was not active, which it shared with Victim-1. On or about December 27, 2018, SHAW sent a text message to CC-1 stating, "[Associate-1] called me saying that a transaction you were working on with [Victim-1] was rejected by the receiving bank because Dominion's license had lapsed. I knew the answer but I told her I would find out. What do you want me to tell her? Call me."

p.  Victim-1 discussed this issue with CC-1, who stated, in substance and in part, that Dominion was restructuring its business and its license would be active again in approximately one week. This was the first time Victim-1 learned that Dominion did not have a bank license.

q.  Based on this information, Victim-1 sent CC-1 an email demanding repayment of Company-1's fees. CC-1 did not respond to Victim-1 and the funds have not been repaid.

14.  My review of a financial analysis conducted by law enforcement revealed that, in total, Dominion received approximately $180,000 from Victim-1, Company-1, and Victim-2. Within a few days of Company-1's deposits, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, received at least two Zelle transfers from CC-1's entity, totaling approximately $970.

### Victim-3 and Victim-4

15.  Based on my interview of a victim of the Scheme and that victim's business partner ("Victim-3" and "Victim-4," respectively), as well as documents provided by Victim-4 and records obtained during this investigation, I have learned, among other things, the following:

9

      a.     In or about 2017, Victim-3 and Victim-4 formed a commodities trading company ("Company-2") based out of Wyoming. Victim-3 and Victim-4 attempted to navigate the world of commodities, but needed a banking relationship to secure financing. Victim-3 and Victim-4 were introduced to a Dominion executive ("CC-3"), who said he was an executive at Dominion Bank and claimed to have tens of millions of dollars in an online Dominion account in his name.

      b.     In an effort to secure financing, Victim-3 and Victim-4 spoke with CC-2, who told Victim-3 that Dominion Bank was a large financial institution that operated in multiple states and managed other people's money, which amounted to approximately billions of dollars in assets. CC-2 said Dominion Bank received money from many churches, which helped Dominion Bank fund commodity trades and other business transactions.

      c.     Eventually, in or about September 2017, Victim-3 and Victim-4 agreed to deposit a minimum of $25,000 in a Dominion Bank money market account to facilitate electronic payment transfers via the SWIFT system on behalf of Company-2. One purpose of the $25,000 deposit was for Company-2 to initiate a relationship with Dominion, so that Dominion could finance Company-2's transactions.

      d.     Following Company-2's deposit of $25,000, Victim-3 was able to access Company-2's account through the Dominion Bank online portal. Initially, it appeared to Victim-3 that Company-2 had a normal commercial banking relationship with Dominion Bank. At some point, Victim-3 thought that Dominion Bank placed approximately $800,000 to $900,000 into Company-2's account to demonstrate proof of funds for Company-2 (in order to aid Company-2's attempted transactions).

      e.     On or about October 16, 2017, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, sent an email to CC-1 and CC-2 advising them to review an invoice for a SWIFT fee related to Company-2.

      f.     On or about November 3, 2017, SHAW sent an email to a representative of a particular bank, advising them of a potential transaction between Company-2 and a customer of the recipient bank. In his email, SHAW further advised that, in connection with this potential transaction, a SWIFT interbank message would be sent by Dominion's relay bank.

      g.     On or about November 14, 2017, CC-2 sent an email to Victim-4 (and copied CC-3 on the email), in which CC-2 attached an account statement for Company-2 on Dominion Bank letterhead. The statement purported to show a $300,000 deposit into Company-2's account as well as a $1,000,000 line of credit.

      h.     Company-2 attempted to engage with counterparties using its Dominion Bank statements, but no other bank would accept the wires because those banks did not recognize Dominion Bank as a legitimate financial institution.

      i.     In addition, Dominion Bank provided Company-2 with SBLCs that Company-2 attempted to use to finance projects. However, Victim-3 explained that counterparties would not accept a Dominion Bank SBLC and said that Dominion Bank's SBLC was a "worthless piece of paper."

j. In light of Company-2's inability to secure financing, Victim-3 asked Dominion to return the $25,000 deposit that Company-2 had made. However, SHAW stated that this deposit was a fee for performing services such as removing administrative holds, depositing funds into Company-2's Dominion account, and issuing several SWIFT messages. In addition, SHAW wrote, "After several discussions with our UK and Treasury regulators, this matter is now closed." (Notably, when SHAW was interviewed by federal agents in August 2022, which is discussed in greater depth below, he stated that he never dealt with government regulators.)

k. Despite Victim-3 and Victim-4's requests for a full refund, Dominion did not refund their payments. Instead, Dominion requested more fees from Victim-3. For example, on or about December 7, 2017, CC-2 emailed Victim-3 and Victim-4 an invoice—which SHAW had prepared and provided to CC-2 via email approximately one day earlier—demanding additional payment, to wit, payment in the amount of 2% of Company-2's funds on deposit with Dominion Bank (which, by that point, had risen to more than $4 million). The invoice directed Company-2 to remit payment to one of Dominion's bank accounts and included the contact information for SHAW, listed as Dominion's Compliance Officer, and SHAW's email address.

l. My review of a financial analysis conducted by law enforcement revealed that, in total, Dominion received approximately $25,000 from Company-2. These funds were deposited on or about October 4, 2017. Within approximately two days of Company-2's deposit, there were several wires or transfers indicative of immediate payments to several Dominion officers, including (among others) a wire to an entity controlled by CC-1 as well as a $500 payment, via Zelle, to SHAW.

### Victim-5

16. During this investigation, HSI interviewed another victim of the Scheme ("Victim-5"). Based on my review of a report of that interview, as well as documents provided by Victim-5 and bank records obtained during this investigation, I have learned, among other things, the following:

a. Victim-5 owned and operated a fuel company based in Suriname ("Company-3"). In or about early 2019, Victim-5 was introduced to an individual ("Individual-1") who worked for a New York-based company ("Company-4"). In early 2019, Company-3 entered into a business agreement with Company-4 to purchase Russian oil and import it to Suriname.

b. On or about February 8, 2019, Individual-1 sent Victim-5 a letter describing their agreement to open a joint account to obtain a line of credit. Pursuant to the agreement, which was dated on or about February 27, 2019, Victim-5 was instructed to send funds to Company-4 to open a joint line of credit at Dominion.

c. On or about March 4, 2019, Victim-5 wired $60,000 from the bank account of a friend to a Company-4 bank account (the "Company-4 Account"). About two days later, Victim-5 sent another $20,000 to the Company-4 Account, and the Company-4 Account wired approximately $60,000 to a U.S. bank account held in the name of Dominion Trust.

    d. On or about March 13, 2019, Individual-1 emailed CC-1, providing a completed application for a $180,000 SBLC. CC-1 forwarded the email to GERALD SHAW, a/k/a "Jerry Shaw," the defendant, and CC-2. CC-1 directed SHAW to review the SBLC application and, if approved, have CC-2 sign it.

    e. On or about that same day, SHAW responded to CC-1 and CC-2 that the terms of the SBLC were approved. In a separate email that day to CC-1, SHAW also sought confirmation that he would be paid $500 for this SBLC. The beneficiary of this SBLC was a third-party company; that company used a Ugandan bank (the "Ugandan Bank"). On or about March 18, 2019, CC-1 sent an email to an email account associated with the Ugandan Bank, attaching the SBLC.

    f. On or about April 11, 2019, the Ugandan Bank notified SHAW that it would not accept the SBLC because Dominion had transmitted the SBLC by email. A trade specialist with the Ugandan Bank advised that it required transmission by SWIFT or, in the alternative, by hard copy.

    g. On or about April 17, 2019, Individual-1 emailed SHAW and CC-1 to tell them a different bank would accept the SBLC. Individual-1 stated that the bank "is requesting a profile of [Dominion] or some other form of verification of dominion financial strength to perform or their financial rating in the business world."

    h. On or about the same day, SHAW responded: "Please be advised that Dominion Bank is a private regulated institution; as such, our audited financial statements are on file with our licensing regulators and not for public consumption. If you need more than our License registration, please have the 'financial institution' you refer to in your email, contact me directly. I would be happy to assist them with any information they need on a 'bank to bank' basis." I have not identified any communications between SHAW and any other banks related to this SBLC.

    i. On or about June 26, 2019, Individual-1 emailed Victim-5, attaching a "Standby Letter of Credit for Swift Delivery" purportedly issued by Dominion Bank to Company-4 in the amount of $1 million. In the text of the email, Individual-1 told Victim-5 that Victim-5's investment would be returned from the proceeds of the monetization of the SBLC (which, based on my involvement in this investigation, I understand to mean leveraging an SBLC to obtain financing). The SBLC was signed by CC-1 and CC-2.

    j. Although Victim-5 paid $60,000 to Dominion Bank, Victim-5 received nothing of value in return and also did not receive a refund, despite making multiple requests to Individual-1. Thus, Victim-5 and Company-3 never received the financing they sought.

<u>GERALD SHAW</u>

  17. Based on my involvement in this investigation—including my review of the resume of GERALD SHAW, a/k/a "Jerry Shaw," the defendant, which was obtained during my review of emails obtained through a judicially authorized search warrant; my interviews of SHAW (which are discussed in greater detail below); and my review of emails and wire information—I believe that SHAW was experienced in legal matters, compliance, and finance, including that: (a) SHAW

obtained a Bachelors of Science in Finance and Accounting at a university in California; (b) SHAW was employed at a particular bank in New York State from 1983 to 2000 as a compliance officer and a member of the board of directors; (c) Dominion agreed to sponsor and pay for SHAW's compliance course (at a university in New York) while SHAW was employed at Dominion; (d) SHAW stated that he is licensed to do compliance work in New York; and (e) SHAW stated that he had 39 years of legal experience prior to his being disbarred, and during his legal career, he represented banks in various deals and ensured that deals were structured correctly.

18. On or about August 9 and 10, 2022, an HSI Special Agent and I interviewed GERALD SHAW, a/k/a "Jerry Shaw," the defendant. During these interviews, SHAW stated, in substance and in part, the following:

a. SHAW knew people from Dominion from his previous work in the banking industry. Dominion was an offshore, online bank with no physical branch locations, though Dominion had offices on State Street in New York City.

b. SHAW performed "contract work" for Dominion beginning in or about July 2016. SHAW first learned about Dominion through CC-1, who introduced him to Dominion's president (CC-2). In or about 2017, Dominion held a "board meeting" in New York, New York, at which SHAW met CC-1, CC-2, and others in person for the only time.

c. SHAW is a former attorney who was disbarred in or about 2012. In or about 2017, SHAW completed a university compliance certification program. After completing the course, his title at Dominion was "Compliance Officer." His primary role was to draft documents, including loan agreements, safe keeping receipts, asset management agreements, and SBLCs. SHAW was to receive $500 for each Dominion project he handled. SHAW did not perform legal work for Dominion, and he never dealt with government regulators. SHAW also did not interface with clients; SHAW believed he was kept from interfacing with clients because he was a convicted felon.

d. SHAW drafted documents, including SBLCs, for Dominion. SHAW characterized SBLC as "like checks" that were issued by a bank; it was "not rocket science to draft one"—SHAW just used a template provided to him by Dominion. SHAW noted that most banks have been drafting SBLCs for years and have their own format for SBLCs. SHAW acknowledged that Dominion should have had the necessary assets to back its financial instruments, including its SBLCs. If Dominion did not have those assets, that would constitute fraud.

e. Dominion represented itself as a legitimate financial institution but really was not. SHAW expected Dominion to have the assets they represented in financial documents, or else that would be fraud.

f. SHAW never saw Dominion's audited financial statements or balance sheet. SHAW knew, however, that Dominion's auditor was not qualified to audit a bank, which concerned SHAW; the auditor was not from a "Big 4" firm. SHAW discussed the audit with CC-1, CC-2, and others at the board meeting in or about 2017.

13

g. SHAW did not know for certain whether Dominion had the assets it claimed, but he observed that Dominion could not reliably pay him $500 per project. SHAW never saw a Dominion client successfully monetize a SBLC, which he considered a red flag.

h. During the interviews, SHAW reviewed a December 3, 2018 email he sent to employees of a bank ("Bank-4"), in which SHAW (1) provided a bank guaranty letter (which he signed) certifying that Dominion had issued an approximately $49.9 million SBLC to a particular customer, and (2) supplied proposed verbiage for a SWIFT message that referenced this issued SBLC (in an amount that also exceeded $49.9 million). After reviewing the email, SHAW stated, in sum and substance, that he had serious reservations about sending the email but did so anyway at the direction of CC-1.

i. SHAW began doubting Dominion's finances when he stopped being paid. SHAW met with Dominion's President (CC-2) in Springfield, and asked CC-2 whether the bank had money, but CC-2 did not respond to the question.

j. At a certain point, SHAW did not believe Dominion had the money it claimed it did. SHAW knew that Dominion "couldn't pay my $500. That scared me."

k. Dominion also did not complete the audit because it did not have the money to pay for it. The "audit issue" bothered SHAW. The audit was supposed to be completed in 2017; Dominion could not operate without an audit. The bank needed the audit in order to be in compliance with Dodd-Frank and Regulation K requirements. And the auditor whom Dominion hired was an individual with "not impeccable credentials" who got her "certification from a cracker jack box." That bothered SHAW as well.

l. It was a "red flag" to SHAW that Dominion issued SBLCs to clients that could not be monetized. If a client asked SHAW to monetize an SBLC from Dominion, he would tell them, "good luck." SHAW assumed that someone would look at a bank with a Gambian license that was attempting to lend on that paper and reject it.

m. Dominion did not have SWIFT capabilities. The fees that Dominion charged customers for sending SWIFT would be paid to the relay bank.

n. SHAW never had any discussions with CC-2 about his qualifications for a compliance officer role.

o. CC-1, CC-2, and at least one other Dominion employee knew that SHAW was a convicted felon.

p. During the interviews, SHAW reviewed a November 3, 2016 email in which SHAW asked CC-2 to use the name "Jerry Shaw" rather than "Gerald Shaw," because the former name was clean. SHAW explained, in the interviews, that by "clean" he meant that the fraud charges, disbarment, and other derogatory information associated with his true name "Gerald Shaw" would not appear in an internet search. SHAW did not want people outside of Dominion to know his criminal history.

14

q.  SHAW stayed at Dominion through at least the end of 2018 and possibly into 2019.

\* \* \*

19.  Based on my review of financial information, I know that from in or around November 2016 until in or around April 2019, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, received at least approximately 59 payments from an entity associated with a Dominion officer; these payments or transfers totaled approximately $43,000. During his interviews, SHAW explained that this is how Dominion paid him for his services.

20.  Based on my review of emails obtained through a judicially authorized search warrant, I am aware that, on or about June 8, 2018, GERALD SHAW, a/k/a "Jerry Shaw," the defendant, sent an email to two Dominion officers in which SHAW acknowledged that Dominion lacked funds. Among other things, SHAW wrote, in substance and in part, that: (a) Dominion was "20 weeks behind" in paying SHAW's "$500 a week salary"; (b) "On several occasions, I have indicated to you that I know Dominion does not have the money to pay my $500 a week [salary]"; and (c) SHAW requested to meet "face to face" with CC-2 in Massachusetts to discuss issues relating to SHAW's employment and compensation, and added, "If Dominion does not have the money to pay my airfare to Springfield, I will find the money to travel to meet with you." Nonetheless, SHAW continued his involvement in the Scheme after June 2018, including by, among various other things, sending a signed bank guaranty letter to a particular bank in December 2018, in which SHAW certified to that bank that Dominion had issued an approximately $49.9 million SBLC to a particular customer. This was a representation that Dominion had assets sufficient to cover that full amount. Thus, even though SHAW knew that Dominion lacked funds, he continued to help Dominion sell worthless financial instruments to victims.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of GERALD SHAW, a/k/a "Jerry Shaw," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

*/s/ authorized signature*
TODD L. KANESHIRO
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 15 day of April, 2023.

_____
THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

15